## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**VANESSA KENDRICK,**

     **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　　**CASE NO. 3:22cv04833-MCR-ZCB**

**TECHFIVE LLC,**

     **Defendant.**

_____/

### <u>OMNIBUS ORDER</u>

Plaintiff Vanessa Kendrick filed suit against her employer, Techfive LLC ("Techfive"), alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and Florida Civil Rights Act, Fla Stat. § 760.01 *et seq.* ("FCRA"). Following discovery, Techfive filed a Motion for Summary Judgment on all counts, and briefing on the Motion is complete. ECF Nos. 44, 49, 54.

The parties are engaged in two additional disputes arising out of Kendrick's Response to the Motion for Summary Judgment. ECF No. 49. First, Kendrick attached an affidavit to her Response verifying the truth of the statements in her Third Amended Complaint, ECF No. 52-14, which Techfive has moved to strike, ECF No. 56. Second, in her Response, Kendrick asked the Court to draw an adverse inference against Techfive due to its alleged spoliation of evidence, to which

Techfive has responded in a separate filing, ECF No. 55.  The Court addresses these disputes separately before turning to Techfive's Motion for Summary Judgment.

## Defendant's Motion to Strike Plaintiff's Affidavit

In her Response to Techfive's Motion for Summary Judgment, Kendrick included an affidavit attesting that the allegations in the Third Amended Complaint are true and correct (the "Affidavit").  ECF 52-14.  Techfive now asks the Court to strike the Affidavit, and in particular, the verification of Paragraphs 16, 19, 22, 27 and 28 of the Third Amended Complaint, arguing that (1) Kendrick stated in her deposition that she had no recollection of the facts alleged in those paragraphs, and (2) belated verification of those paragraphs deprives Techfive of the opportunity to cross-examine her about those allegations.

Kendrick filed a Corrected Second Amended Complaint, ECF No. 20, on June 10, 2022, which became the operative pleading pursuant to Court order four days later, ECF No. 22.  Techfive filed a motion to dismiss, and in her response, Kendrick requested leave to file the Third Amended Complaint in order to correct minor drafting errors in the paragraph numbers referenced when describing her causes of action and two erroneous uses of the phrase "constructive termination" instead of "demotion."  ECF No. 29 at 15.  The Court granted leave on March 22, 2023, and

Kendrick filed her Third Amended Complaint on the same day.  ECF Nos. 39, 40. Other than those minor changes, the Third Amended Complaint is identical to the Corrected Second Amended Complaint.  The Third Amended Complaint was not verified.  Techfive deposed Kendrick on January 4, 2023, approximately seven months after Kendrick filed her Corrected Second Amended Complaint but before she filed the Third Amended Complaint.

## I.    Legal Standard

The "sham affidavit" doctrine authorizes a court ruling on a motion for summary judgment to disregard evidence that clearly contradicts prior sworn testimony when offered without explanation: "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

Because there is a fine line between witness credibility, which is the sole province of the jury, and a sham affidavit, which may be disregarded as not representing a genuine issue of fact, courts are careful not to disregard affidavits as a sham for "every failure of memory or variation in a witness's testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986).  The Eleventh Circuit has

further directed that the sham affidavit doctrine should be applied "sparingly because of the harsh effect it may have on a party's case." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1307 (11th Cir. 2016) (citations and quotations omitted).

For these reasons, only an affidavit that is "inherently irreconcilable" with an affiant's earlier testimony may be disregarded. *Tippens*, 805 F.2d at 954 n.6. "The earlier [allegedly contradictory] deposition testimony must consist of 'clear answers to unambiguous questions,'" *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986) (citation omitted), and the later affidavit must contain unexplained "flat contradiction[s]," *Tippens*, 805 F.2d at 953.

## II.   Discussion

Techfive's argument that belated verification of the Third Amended Complaint deprived it of the opportunity to cross-examine Kendrick about the allegations in her deposition is meritless. Techfive was aware of the allegations in Paragraphs 16, 19, 22, 27, and 28 months before deposing Kendrick because they were included in the Corrected Second Amended Complaint and notably did not change in the Third Amended Complaint. Techfive had the opportunity to examine Kendrick about them during her deposition—and, in fact, took that opportunity.

Second, because Techfive does not allege that Kendrick's deposition "consist[s] of clear answers to unambiguous questions" that contradict the verified

Third Amended Complaint, *Lane*, 782 F.2d at 1532, but rather of failures to recall allegations made in the Third Amended Complaint, the verified Third Amended Complaint is not a sham.  Kendrick's deposition and the Third Amended Complaint are not "inherently irreconcilable," *Tippens*, 805 F.2d at 954 n.6, and binding Eleventh Circuit precedent prohibits the Court from striking the Affidavit.

Techfive further argues that allowing Kendrick to rely on allegations she withheld from her deposition testimony undermines the purpose of summary judgment.  Specifically, it argues that (1) the Affidavit is not based on Kendrick's personal knowledge, as evidenced by her failure to remember the allegations during her deposition; (2) depositions are more reliable than affidavits; and (3) the Affidavit is an improper attempt to nullify and undermine the purpose of discovery and summary judgment.

Techfive's first and second arguments ask the Court to make improper credibility determinations regarding Kendrick's testimony and sworn statements.  A court may not make credibility determinations or weigh the evidence presented on summary judgment.  *See Frederick v. Sprint/United Mgm't Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).  This is why courts are careful not to disregard affidavits as a sham for "every failure of memory or variation in a witness's testimony."  *Tippens*, 805

F.2d at 953.   Kendrick's failures of memory and minor variations in testimony during her deposition are not a basis for striking her Affidavit as a sham.

Techfive's third argument fails because the allegations in Kendrick's verified Third Amended Complaint were included in the Corrected Second Amended Complaint.   It is also common practice for parties to file affidavits with their summary judgment motions and responses, as Techfive itself has done.   The verified Third Amended Complaint does not undermine the purposes of discovery and summary judgment.

Techfive further argues that the "Eleventh Circuit has held that permitting the filing of affidavits after a motion for summary judgment is filed would prejudice the opposing party" and should be stricken, but the cases it cites in support are inapposite.   ECF No. 56 at 11.   In *Pete's Towing Co. v. City of Tampa*, 378 F. App'x 917 (11th Cir. 2010), the Eleventh Circuit affirmed a decision to strike the portions of an affidavit that included allegations that had not been previously disclosed to the opposing party; the portion of the affidavit that contradicted deposition testimony were not stricken by the district court.   *Id.* at 920.   And *Williams v. Marinemax of Central Florida LLC*, 773 F. Supp. 2d 1265 (N.D. Fla. 2011), relates to a belated written report of an expert witness.

For the reasons stated above, Defendant's Motion to Strike Plaintiff's Affidavit is denied.

## Plaintiff's Request for a Spoliation Sanction

Kendrick improperly asks the Court in her Response to draw an adverse inference against Techfive regarding the missing (1) November 2018 Corrective Action Plan ("CAP") Techfive provided Kendrick[1] and (2) raw data regarding Kendrick's performance.   The Court denies this request because it is "both procedurally deficient and substantively meritless."  *Carolina v. JPMorgan Chase Bank NA*, No. CV-19-05882-PHX-DWL, 2021 WL 5396066, at *9 (D. Ariz. Nov. 17, 2021) (denying request for adverse inference sanction made in a response to a summary judgment motion).

First, a request for an adverse inference is a request for affirmative relief and must be raised in a separate motion.  *Id.*; Fed. R. Civ. P. 7(b).  "[C]ompliance with [the Federal Rules of Civil Procedure] is not merely aspirational."  *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008).  Rules have a purpose.  Filing a motion would

---

[1] The record shows this was a Performance Improvement Plan, not a Corrective Action Plan.  ECF No. 52-1.  The Court uses "Corrective Action Plan" to maintain consistency with the parties' filings.

CASE NO. 3:22cv04833-MCR-ZCB

have given Kendrick more space to explain the basis for her request (an explanation which is sorely lacking in the Response), required her to confer with Techfive, and would have made clear that Techfive may file a full response to this request (which it did, ECF No. 55).

Second, Kendrick fails to show that Techfive intentionally spoliated evidence or that sanctions are warranted.  "Because spoliation is an evidentiary matter, 'federal law governs the imposition of spoliation sanctions.'" *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (quoting *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005)).[2]   Under federal law, "[s]poliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence." *Tesoriero*, 965 F.3d at 1184.  Rather, "sanctions for spoliation are appropriate only when there is evidence of bad faith." *Foulke v. Weller*, No. 3:20cv5506/MCR/EMT, 2021 WL 8267531, at *5 (N.D. Fla. Dec. 6, 2021) (citations omitted), *report and recommendation adopted,* 2022 WL 766662 (N.D. Fla. Mar. 14, 2022) (citing *Flury*, 427 F.3d at 944).  Bad faith, "in the context

---

[2] Kendrick erroneously argues for the application of Florida state law based on *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003).  In that case, the plaintiffs brought fraud claims against the defendants, alleging that the defendants had engaged in widespread fraud in settling prior litigation with them.  Because the plaintiffs sued for recovery based on Florida tort law, Florida law applied to the question of whether the defendants had engaged in fraudulent conduct during the litigation and settlement, including whether they had spoliated evidence.  *Green Leaf* did not address a motion for spoliation sanctions.

of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Tesoriero*, 965 F.3d at 1184; *Foulke*, 2022 WL 766662, at *2.

Kendrick argues that the mere absence of the CAP and raw data demonstrates intentional spoliation.  But if it did, every instance of missing evidence would be cause for sanctions and this simply is not correct.  Kendrick fails to point to any evidence of bad faith or intentional destruction of evidence on Techfive's part.  *See Slattery v. Precision Response Corp.*, 167 F. App'x 139, 141 (11th Cir. 2006) (affirming refusal to draw an adverse inference where Plaintiff "ha[d] shown no evidence that [Defendant] withheld or tampered with any of the documents in bad faith").

Moreover, Kendrick agrees that she received the CAP in November 2018 and should be able to testify to its contents; there is no reason to believe Techfive is intentionally withholding a document Kendrick has already seen.  Second, Techfive's corporate representative testified that the raw data sought by Kendrick is no longer in Techfive's possession because it was maintained on systems belonging to a third party that withdrew Techfive's access when the business relationship ended.  ECF No. 52-22 at 25-26.  The Court will not draw an adverse inference regarding the missing evidence.

### **Defendant's Motion for Summary Judgment**

Kendrick's suit against Techfive[3] alleges age discrimination and retaliation under the ADEA (Counts I and II), disability discrimination and retaliation under the ADA (Counts III and IV), and age and disability discrimination under the FCRA (Counts V and VI).  Kendrick filed two administrative charges of discrimination before filing her lawsuit, one on or around April 30, 2019, alleging discriminatory hostile work environment and demotion ("First Administrative Charge"), and one on July 9, 2020, alleging discriminatory and retaliatory failure to promote ("Second Administrative Charge").  Kendrick's federal law claims are based only on the Second Administrative Charge.  ECF No. 40 ¶ 5.  Her state law FCRA claims for age and disability discrimination arise out of both the First and Second Administrative Charges.  *Id.*

---

[3] Also referred to as "iQor" in the evidentiary record.

CASE NO. 3:22cv04833-MCR-ZCB

## I.   Background[4]

Techfive provides customer support solutions for businesses.  It operates call centers throughout the United States, and in December 2016, it acquired a site in Crestview, Florida.   In the Crestview site, newly hired customer call agents are trained for six weeks before graduating and transitioning to the "floor," where agents take customer calls.  During the first four weeks of training, one trainer teaches a curriculum to a class of approximately 20 trainees.  These four weeks are followed by two weeks of on-the-job training, with new hires taking customer calls in a controlled setting with trainer and peer advisor support.  Peer advisors are agents who already work on the floor.  The trainer and peer advisors assist with calls and answer questions, and after the calls the trainer individually coaches trainees[5] and provides feedback.  These two weeks are called "nesting."  To graduate, trainees need to "pass" a certain number of customer calls, called "quality quest" calls.  After passing, they work as customer support agents on the floor under the oversight of a

---

[4] For the limited purposes of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," Kendrick.  *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted).  The Court bears in mind that a dispute of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5] These coaching sessions are called "coachings."

supervisor. If they fail the class, they are terminated. Techfive has a strict attendance policy during the training period.

Kendrick has worked at the Techfive Crestview call center since its acquisition on December 1, 2016.[6] She was 58 years old at the time the Crestview location was acquired. Since August 2017, she has suffered from a panic disorder and anxiety, requiring her to take intermittent leave as necessary to deal with panic attacks. Kendrick claims that she suffered discriminatory treatment and hostility based on her age and disability, causing her to be demoted in 2018, and along with retaliation for filing her First Administrative Charge, preventing her subsequent promotion.[7]

In December 2016, Kendrick was assigned to train newly hired call center agents for Techfive's client, DirecTV. Unlike the other DirecTV trainers, Kendrick had no prior experience with DirecTV and was not trained on the DirecTV materials before beginning to teach them; instead, her supervisor, Katie Wyatt, had her sit

---

[6] Prior to Techfive's acquisition, Kendrick had worked at the Crestview site since 2007, and at some point began training newly hired call center agents on how to respond to consumer warranty inquiries.

[7] The Third Amended Complaint and Response are far from models of clarity, making it difficult to discern the chronology of events and Kendrick's theories of discrimination. The Court has endeavored to view the allegations in the light most favorable to Kendrick while culling out matters that have no apparent relation to her claims.

through a training class for agents and told her to learn the materials by handling customer calls.  In June 2017, Wyatt was promoted, and Kendrick began reporting to Kayleigh White (age 31 at the time),[8] who in turn reported to Katie Wyatt.  Also in June 2017, "DirecTV communicated increased expectations for Agents graduating the training program, which, in turn, raised the expectations for the Trainers' performance."  ECF No. 45-9 at 3.  Beginning in October 2018, White began reporting to Meghan Wilt, who replaced Wyatt.  All other DirecTV Crestview trainers were younger than Kendrick and the three trainers White hired between 2017 and 2019 were women in their 20s and 30s.

According to a document drafted by Kendrick related to her EEOC complaint,[9] in October 2016, Kendrick trained under DirecTV trainer Sean Keith McMillan to learn the DirecTV program.  She never went through a "train the trainer" class.  In January 2017, Kendrick writes, "I was assigned my first new hire class for DirecTV . . . a tenured trainer should have been assigned . . .  The class and myself finally received our training permissions near the end of week 2 [of the class].  I asked Kathrine Wyatt my manager at that time to extend the class for an additional

---

[8] White resigned after taking leave in June 2019.

[9] Neither party cited to this document in the record.  Unfortunately, at several points throughout the drafting of this Order, the undersigned has been forced to comb the record for a relevant timeline of events.

week and she denied my request.  However, Kathrine Wyatt did send the other trainers to assist . . . .  This caused a lot of doubt and frustration among the new hires . . . .  Due to this situation many of the new hires quit prior to going to the production floor."  ECF No. 45-3 at 337.

In June 2017, Wyatt was promoted and White became Kendrick's direct supervisor.  White made seven or eight age-based comments to Kendrick beginning in June 2017.  Specifically, White stated: (1) "Someone your age should not be a trainer.  You should quit." (date not provided or apparent from the record); (2) "You're older and lack the vitality that a younger trainer has." (July 21, 2017); (3) that as Kendrick gets older, she cannot remember things very well (August 16, 2017); (4) that Kendrick was too old to be a trainer (comment made two or three times in a meeting on or around September 26, 2017); (5) that she was surprised Kendrick did so well in her annual evaluation given her age (December 2017); (6) and that in England, where White was from, companies could not fire older people, "that they just treated them like shit until they quit" (date not provided or apparent from the record).  ECF Nos. 52-14 ¶¶ 12, 14, 19, 22 and 45-3 at 80, 127.[10]  Kendrick

---

[10] White was not asked about these statements in her deposition.  No other deposed trainers heard White make age-related statements.  ECF No. 45-4 at 16; ECF No. 45-5 at 13.  Techfive denies that these statements were ever made.  Facts are viewed in the light most favorable to the non-movant.

reported several of these comments to Melissa "Missy" Dalrymple, a human resources generalist, and/or Katie Wyatt, White's supervisor.[11]

In or around August 2017, Kendrick first requested FMLA leave and informed White of her disability. Kendrick requested this leave because her condition was triggered when two trainees shouted and swore at her and chased her out of the room. When Kendrick reported this to White, White called a meeting with Kendrick and one of the trainees involved. The trainee made false allegations, and when Kendrick tried to defend herself, White told Kendrick to "shut up."[12] Kendrick reported the incident to Human Resources, but the two trainees were not terminated. None of the comments during these exchanges were directed at Kendrick's age or disability. Kendrick was diagnosed with PTSD as a result of this event.

The record reflects that Kendrick had job performance and behavioral issues beginning in January 2017, with her first trainee class. She was unfamiliar with the training materials and experienced high trainee attrition. White observed Kendrick's class in June and July of 2017 and concluded that her delivery was poor, that trainees

---

[11] Dalrymple does not recall Kendrick discussing these comments with her but recalls that Kendrick spoke with her 2-4 times about White treating her differently than other trainers. Facts are viewed in the light most favorable to Kendrick, as the non-movant.

[12] White explained that she ended the meeting because "Vanessa actually called [the trainee] a name in front of me." ECF No. 45-10 at 42.

CASE NO. 3:22cv04833-MCR-ZCB

did not fully comprehend the materials, and that there was significant unused time in the class when trainees chatted with each other.   Trainee surveys from 2018 include low ratings from trainees with complaints that she was not knowledgeable, failed to adequately prepare trainees for taking calls, favored certain trainees over others, and was unable to control her class.   In 2017, Kendrick received a proposed merit rating of 2 out of 5 (as did one other trainer in Crestview).   Kendrick also had high rates of trainee absenteeism and attrition and failed to follow attendance and disciplinary procedures for trainees consistently.   Kendrick does not specifically dispute any of this other than to generally argue that White fabricated this information because of discriminatory bias.

However, these performance and behavioral concerns are supported by several documents not created by White.   For example, Wyatt sent an email with Kendrick's 2017 proposed merit rating of 2 out of 5.   ECF No. 45-9 at 27.   An email from Wilt shows that on November 14, 2018, Kendrick had the highest trainee absenteeism and attrition rates for all trainers in the enterprise at the time, with an attrition rate of 33.33%.   The expectation was 18%.   ECF No. 45-9 at 10.   A screenshot of trainer attrition rates throughout the enterprise taken by Kendrick on December 11, 2018, shows that on that date she had the highest attrition rate in the Crestview office, at 27.06% (although several trainers in other locations had higher

attrition rates than her; their names are redacted from the screenshot and the record contains no information about those trainers).  ECF No. 45-3 at 363.  Trainer Sean Keith McMillan, born in 1968, reported that when peer advisors and trainees complained about Kendrick's inability to control her class, Kendrick told them she was unable to perform because of her PTSD.  ECF No. 45-9 at 31.  Trainer Christopher King, born 1988, testified that Kendrick "displayed a few signs that she didn't really understand the information that she was teaching," and had a "lack of ability to produce quality candidates . . . for the job," ECF No. 45-4 at 9, 16.  Finally, an excel document of trainee reviews of trainers from 2018 includes positive reviews of trainers McMillan, Miller, and Hyatt, but mostly negative reviews of Kendrick, including:[13]

> It would have been easier on the nesting row if she would have got up & helped the PAs – our handle time would have been lower & it would have made it alto easier on the PAs, but on a positive note she is super sweet & generally a wonderful lady.  Vanessa is a wonderful person, she's funny & kind but often showed a lack in knowledge when it comes to the material we were going over, she did also play favorites in the class when it came to absent or tardy employees. . . .  Vanessa was made aware by a PA of the complaint however the PA informed Vanessa she advised the agent to just write it on the end of class survey & the complaint was not addressed.  On nesting row there was a day where we had only 1 PA – so you would have to ask Vanessa to come help & would just say 'I don't know' walk away & tell Nichole to help us instead – this happened often.  Also, a few members of our class

---

[13] All grammatical and typographical errors in original.

CASE NO. 3:22cv04833-MCR-ZCB

have quit because she singles them out in the beginning – I was one of them but a colleague stuck up for me in week 3 & she has been pleasant to me ever since.   Trainer had a bad habit of treating everyone differently, no one was coached the same.   She very clearly picked favorites which was the cause of 4 people to just quit.   Also on nesting row she was very uncertain of herself when helping us & always had to check with a PA to make sure she was giving correct information.   She often at times said she had covered things that she had never covered. Other trainers have covered with their classes that we never had covered.   Trainer also discussed with the whole class negative action that she was going to take to reprimand one of the PAs which isn't professional.   She did not handle the class in a professional manner in my opinion.   I would recommend additional training for this trainer before her next class.   We were also warned by the trainer that if people said anything negative about her outside of class, that there were plenty of prior students that would put them in their place. . . .

ECF No. 45-8 at 24.

On September 26, 2017, White placed Kendrick on a Performance Improvement Plan ("PIP") because of problems she had explaining training materials and managing trainees' classroom behavior.   The PIP notes that Kendrick had the highest trainee attrition rate among White's Crestview trainers.   Kendrick responded to the PIP saying that she had never received clear expectations for the class, that White did not sufficiently observe her class, and that she was being treated for anxiety.

Nearly a year later, on September 18, 2018, White issued Kendrick an Action Plan.   White emailed the Plan to Kendrick, cc'ing Wyatt and Dalrymple, writing:

"As discussed after your last class – I have prepared your action plan for your review which you will be able to take with you into nesting.  I have added specific action items that you mentioned you would like to have included on the plan based on our discussion on 8/21 – thank you for your input, this has really helped & I am confident this will aid in your success with your current class."  ECF No. 45-8 at 28.  The Plan included goals such as "treat all employees equally," "improved stats," "contribute to team action plans," and "review daily data."  ECF Nos. 45-8 at 29, 52-6.

In October 2018, Wyatt, White's supervisor, was replaced by Wilt.  At that time, White and Wilt discussed the performance of the trainers under White's supervision, including Kendrick.   White explained that Kendrick was underperforming in her position.  Wilt reviewed the matter and found that, as of November 14, 2018, Kendrick had the highest attrition rate for all trainers in the enterprise for that year, at 33.33%.  The expectation was 18%.  Kendrick also had the highest trainee absenteeism rate for the enterprise for 2018.  After consultation with Dalrymple, White and Wilt issued Kendrick a PIP November 21, 2018, with the goals of "following attendance and policy practices consistently," "addressing agent concerns in a timely manner," "avoiding negative feedback on the production

floor and training environment," and "providing agents with sufficient coaching."[14]

ECF No. 52-1.  Techfive found that Kendrick did not meet these goals, and on

December 14, 2018, Kendrick was given a Corrective Action Form, placed on a

Final Warning and demoted from trainer to customer call agent.  The Corrective

Action Form states that Kendrick had not met the November PIP action items, did

not timely coach trainees on quality quest calls, proactively instructed a trainee to

resign due to failing quality quest so she could be rehired in the future, and

improperly transferred no call/no show agents to the floor in the software system to

reduce her attrition rate.  Kendrick states that she consistently coached trainees on

quality quest calls but does not state whether she did this timely.[15]  The decision to

---

[14] This PIP is not in the record and is the subject of Kendrick's request for spoliation sanctions, addressed above.  The PIP, however, is summarized in the December 14, 2018, Corrective Action Form, which is in the record.

[15] Kendrick also states that she did not instruct a trainee to resign and that she did not transfer no call/no show trainees to the floor.  But rather than disputing the allegations, she explains that her conduct was justified because trainer McMillan, while filling in for White, advised or directed her to take these actions.  Other documents reflect that McMillan directed her to terminate the no call/no show trainees, but facts are viewed in the light most favorable to the non-movant. In any event, courts are not "super-personnel departments" and an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citation omitted).

Kendrick also challenges her attrition rate, testifying that she viewed her "attrition just probably within a week of the attrition that I saw, and it was at 27 percent, which there was a multitude of [trainers] that had that or higher." ECF No. 45-3 at 54.  This appears to be a reference to the screenshot taken on December 11, 2018.  ECF No. 45-3 at 363.  It is undisputed that Kendrick's attrition rate was significantly higher than the goal of 18%.

demote Kendrick was made with the input of White, Wilt, Dalrymple, Lex Davis (Dalrymple's superior), and Mike Holmes (director of the Crestview location) based on information provided by White. There was no independent investigation of Kendrick's performance. Several months after Kendrick's demotion, her position was filled by Heather Bowman, a woman in her 30s. Kendrick remains employed by Techfive as a customer call agent.

Kendrick identifies several instances while she was a trainer in which she felt she was treated poorly or differently than other trainers, all of whom were younger. Kendrick complained to Dalrymple that her trainees were only allowed two opportunities to pass her class whereas trainees in another class were given six chances, but nothing was done. White explained by deposition that Techfive changed the policy in August 2018 to grant trainees more than two opportunities to pass a class if the trainer believed the trainee could pass after additional training, but that this policy was only implemented going forward, not in classes that were already in progress, which included Kendrick's. Kendrick presented no evidence to dispute this explanation.[16]

---

[16] Indeed, the record reflects that in or around November 2018, several of Kendrick's trainees were given four and even five opportunities to pass. ECF No. 45-9 at 19-20.

CASE NO. 3:22cv04833-MCR-ZCB

In September 2018, Heather Bowman, a non-management employee in her 30s with no supervisory responsibility over Kendrick, said to Kendrick: "God you are so old, I don't understand how you do half the job you do," which Kendrick reported to White.[17]  White did not inform her own supervisor about this statement. No corrective action was taken.

Kendrick also says that White prohibited her from using peer advisors to assist trainees with a specific task in one of her classes, whereas other trainers did not have that restriction, and White once asked Kendrick, in a private email, to correct the date and class week number in her trainer-wide "end of day" summary emails, whereas she did not ask trainers Miller and McMillan to correct similar errors.  After complaining to Dalrymple about White treating her differently than younger trainers, White told her during a routine one-on-one meeting that "if anyone goes over my head . . . I'll make them pay."  ECF No. 45-3 at 118.  Kendrick also says that White assigned Kendrick to assist another trainer but never had anyone assist her, and that when Kendrick allowed two sick trainees to leave work, White questioned her decision, whereas trainer McMillan was not reproached for doing the same. Notably, although Kendrick's failure to follow attendance policies is one of the bases

---

[17] White denies knowledge of age-related comments made by Bowman.  Again, the facts are viewed in the light most favorable to Kendrick.

of the November 21, 2018, PIP, the record includes no other formal reprimands of Kendrick based on these instances.[18]

Kendrick also alleges that White once disregarded her disability accommodation of a two-week break between classes.  Kendrick acknowledges that all Crestview trainers received this two-week break between classes but explained that White told her she had discussed Kendrick's medical condition with Dalrymple and determined that this two-week break would accommodate her condition.  The

---

[18] The Court disregards several incidents described by Kendrick because they are either conclusory, not based on personal knowledge and contradicted by the record, or irrelevant.

First, Kendrick alleges that White demanded she document all coachings, whereas trainer Miller did not document coachings and was not disciplined for failing to do so.  Kendrick does not have personal knowledge regarding Miller's documentation, and only heard Miller state that she would not document coachings.  Miller testified in her deposition that she documented her coachings.

Second, in mid-August 2018, Kendrick conveyed concerns to White and Dalrymple about certain trainees in her class smelling of marijuana.  Kendrick is unaware of any follow-up to her concerns.  This allegation is irrelevant to Kendrick's claim of disability and age discrimination and she does not know whether other trainers were treated differently under similar circumstances.

Third, On September 14, 2018, White organized a fiftieth birthday celebration for trainer McMillan and sent a group email announcing it, starting a collection for him, and expressing her plan to purchase gifts and decorate the office.  Kendrick replied to White privately asking her to leave her age out of the email when her birthday comes around.  White replied that she would be happy to leave out the number.  On September 24, 2018, White emailed the team that she would not be coordinating birthdays moving forward due to "financial input" and that the team was welcome to coordinate birthdays and gather collections.  She added that she would hold on to existing decorations for future use and bring in balloons and a card for future birthdays.

Fourth, Kendrick states that her requests to shadow other trainers' classes were denied, but there is no evidence that this is related to her age or disability.

CASE NO. 3:22cv04833-MCR-ZCB

record does not include any formal documentation regarding this alleged accommodation, unlike later accommodations Kendrick received.

King, a former trainer terminated by Techfive after engaging in a verbal altercation with White, commented on Kendrick's demotion as follows:

> And I felt like I – At iQor, they had things called Exit Plans. So, if I had an associate that wasn't meeting his or her needs, in training, we would create a plan in which we held them extremely accountable to basically always leading to termination. It was – We called it an Exit Plan, but it was 100% just basically a way to get rid of these people. And I felt like based on things that I was instructed to do, I felt like they had an exit plan for Vanessa. I don't know this for sure, but seeing the work that they gave her, and the unrealistic expectations that they held her to, it – they put her in a position where she was not capable – it was not possible for her to meet the goals set forth by her employer, and it was like they set her up for failure intentionally hoping that this would lea[d] to her no longer being employed with the company.

ECF No. 45-4 at 19-20. He also provided the opinion that White was difficult to work for and disliked several trainers: "[I]t was very common for Kayleigh to express thoughts that maybe she shouldn't say out loud . . . . It was – it was known – a known item that she was not a fan of Vanessa, or myself, or a couple of other trainers for that matter. Vanessa, specifically, was because of her lack of ability to produce quality candidates, I guess, for the job." *Id.* at 15-16.

Kendrick filed her First Administrative Charge on or around April 30, 2019, checking the boxes for age and disability. Her written explanation complained of

disparate treatment and mistreatment by White due to her age and disability, White's failure to take corrective action when she reported an age-related comment by Bowman, being targeted for failure in favor of less qualified younger non-disabled trainers, and her demotion in December 2018.

Kendrick asserts that after she filed her First Administrative Charge, Techfive purposely withdrew job opportunities and prohibited her from applying for open positions while hiring younger and less qualified individuals.  It is undisputed that Kendrick applied for a promotion to a trainer role on June 19, 2020, along with ten others.   Ultimately, however, no one was interviewed for the position because Techfive instead transferred a supervisor with a successful training background, Jason Goins, into the role.  Techfive explains that this was done in order to manage head count during the COVID-19 pandemic and that if not for the transfer, Goins would have been furloughed or laid off.  Kendrick does not dispute this.

Techfive's corporate records show that Kendrick did not apply for any other positions.  Kendrick states that Techfive "purposely withdrew job availability for [her] old job after [she] applied," that she "wanted to apply for several open and available supervisor positions" but that Techfive "prohibited" her from applying, kept the positions "hush hush," and "hired two significantly younger and less qualified individuals for these positions," ECF Nos. 52-14 at ¶ 50, 52-27, but

inexplicably Kendrick also states that she *did* apply for three additional positions—one trainer position at some unspecified time and one or two supervisor positions in or around May 2020.  However, Kendrick is unable to identify even one person hired for these positions, stating only that one position was filled by someone younger and another by one named "Nichole."

Kendrick filed her Second Administrative Charge on July 9, 2020, stating she suffered age and disability discrimination and retaliation from January 2020 through June 29, 2020, and alleging "continuing action."  Kendrick's written explanation states that Techfive discriminated and retaliated against her for filing the First Administrative Charge by keeping job openings secret and hiring younger, non-disabled persons to fill them.

In 2020, after filing her Second Administrative Charge, Techfive denied several requests by Kendrick to allow her to leave customer calls mid-call or have her supervisor complete calls when experiencing a panic attack.[19]

In 2020, in a weekly team meeting, Kendrick's supervisor (no longer White) told the team that individuals would receive a merit increase and bonus only if they

---

[19] This allegation is not included in the Third Amended Complaint, and Kendrick raised it for the first time in her Response to Techfive's Motion for Summary Judgment.

worked a minimum of 35 hours per week,[20] including paid time off but excluding FMLA leave.  Kendrick alleges that the supervisor told the team that the reason for this new policy was because individuals were taking off too much ADA or FMLA time, singling out one of Kendrick's coworkers.  Kendrick received the bonus and merit increase that year because she passed the 35-hour mark.[21]

In 2021, Kendrick discovered that Techfive did not prepare a performance evaluation for her in 2019 to evaluate her for a promotion and raise.  After communicating the issue to Dalrymple, Kendrick received the raise.

In February 2021, Techfive distributed a shift bid for customer support agents.  At that time, Kendrick did not work on Fridays and Saturdays, which allowed her to participate in her Saturday PTSD support group.  She also had a set schedule from 7:00 AM to 3:30 PM with two 15-minute breaks and one 30-minute lunch break during the day, pursuant to medical documentation stating that these breaks were a recommended ADA accommodation.  ECF No. 52-23.  Kendrick's need to have Saturdays off was not listed.  *Id.*

---

[20] In her deposition, Kendrick put this figure at 32 hours per week.  The discrepancy is immaterial.

[21] In her deposition, Kendrick stated that it is theoretically possible that she would have been eligible for other bonuses she did not know about had Techfive counted FMLA leave toward hours worked.  The Court disregards this unfounded speculation.

On February 9, 2021, before receiving her shift, Kendrick informed Dalrymple that she required an ADA-approved schedule of 7 AM to 3:30 PM with two 15-minute breaks and one 30-minute break.  Dalrymple assured her she would apply these accommodations once Kendrick received her shift.  After the shift bid was complete, Kendrick was provided the required breaks but her days off were Sunday and Monday.  When Kendrick told HR she needed Saturdays off to meet with her support group, HR asked for updated ADA documentation.  Kendrick provided Techfive medical documentation from her therapist dated February 26, 2021, stating that "[i]n addition to what is contained in the ADA Accommodation Recommendations dated 12/4/19," Kendrick needed Fridays and Saturdays off to meet with her support group.  ECF No. 52-24.[22]

Techfive approved the accommodation on March 22, 2021, and provided Kendrick with a set schedule including two 15-minute breaks and one 30-minute lunch break and Fridays and Saturdays off.  Kendrick does not dispute that she received this accommodation, and she is currently able to perform the agent position with the accommodations she has in place.

---

[22] Kendrick states in the Third Amended Complaint that "Defendant already had this information from medical documentation based on Plaintiff's disability."  ECF No. 52-14 ¶ 43. But the undisputed evidence, proffered by Kendrick, clearly shows otherwise.

CASE NO. 3:22cv04833-MCR-ZCB

## II.   Legal Standards

### a.  Summary Judgment

Summary judgment is appropriate where the record reflects that there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex*, 477 U.S. at 323).  Once that burden is met, the nonmoving party must "go beyond the pleadings" and present competent record evidence showing the existence of a genuine, material factual dispute for trial. *Celotex*, 477 U.S. at 324.  In doing so, and to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In assessing whether a movant is entitled to summary judgment, a court must view the evidence and factual inferences drawn therefrom in the light most favorable to the non-moving party. *See Liberty Lobby*, 477 U.S. at 255. The self-serving statement of a litigant can defeat summary judgment if it is based on personal knowledge and is not conclusory in nature. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (self-serving sworn statements are not to be disregarded at the summary judgment stage). However, a court will only consider "specific facts" and "concrete particulars"; conclusory statements and general allegations will not create a material issue of fact for summary judgment. *Stein*, 881 F.3d at 857; *Feliciano*, 707 F.3d at 1253.

"The purpose of summary judgment is to determine, on the basis of evidence that must be forthcoming, whether there is any dispute as to an issue of material fact, as distinguished from a party's mere allegations." *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion

CASE NO. 3:22cv04833-MCR-ZCB

for summary judgment."   *Scott v. Harris*, 550 U.S. 372, 380 (2007).   If the nonmoving party's claims consist of nothing "more than a repetition of his conclusional allegations," summary judgment is "not only proper[,] but required." *Morris*, 663 F.2d at 1034.

### b.  Exhaustion of Administrative Remedies

The ADA, ADEA, and FCRA all require a plaintiff to exhaust her administrative remedies by filing a Charge of Discrimination with the Equal Employment Opportunity Commission or the Florida Commission on Human Rights before filing suit.   *See Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (ADA); *Marquez v. Costco Wholesale Corp.*, 550 F. Supp. 3d 1256, 1273 (S.D. Fla. 2021) (ADEA); *Jones v. Bank of Am.*, 985 F. Supp. 2d 1320, 1324-25 (M.D. Fla. 2013) (FCRA).

The Eleventh Circuit "has noted that judicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate." *Gregory v. Georgia Dep't of Hum. Res.*, 355 F.3d 1277, 1279-80 (11th Cir. 2004) (citation omitted).  Although a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination[,] . . . the scope of an EEOC complaint should not be strictly

interpreted." *Id.* at 1280 (quotations and citations omitted).  The "proper inquiry" for exhaustion of administrative remedies is whether the plaintiff's complaint is "like or related to, or grew out of, the allegations contained in her EEOC charge." *Id.*

### c. Discrimination under the ADA, ADEA, and FCRA

Discrimination in employment may be proved using either direct or circumstantial evidence.  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999).  "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (internal marks and citation omitted).  Only blatant remarks "whose intent could be nothing other than to discriminate on the basis of age," such as "a management memorandum saying, 'Fire Early—he is too old,'" qualify as direct evidence. *Damon*, 196 F.3d at 1359 (citation omitted).  "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Manigault v. Comm'r, Soc. Sec. Admin.*, 609 F. App'x 982, 985 (11th Cir. 2015) (quoting *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

If there is no direct evidence of discrimination, a plaintiff may prove discrimination through circumstantial evidence, using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this framework, the plaintiff must establish a *prima facie* case of discrimination, *id.* at 802, the elements of which vary with the context of the claim. If the *prima facie* case is met, it gives rise to "a presumption that the employer unlawfully discriminated against the employee." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citation omitted). The employer must then articulate a "legitimate, nondiscriminatory reason for the challenged employment action." *Id.* (citation omitted). This intermediate burden of production by the employer is "exceedingly light." *Bradley v. Pfizer, Inc.*, 440 F. App'x 805, 808 (11th Cir. 2011) (quoting *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1019 (11th Cir. 1994)). If the employer sets out a legitimate reason for the challenged employment decision, the presumption of discrimination is eliminated, and "the factual inquiry proceeds to a new level of specificity." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981).

At the last stage, the burden of production shifts back to the plaintiff, who must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude" that the employer's proffered reason is a pretext for discrimination. *Chapman*, 229 F.3d at 1024 (citation omitted). "A reason cannot be proved to be a pretext for *discrimination* unless it is shown *both* that the reason was false, *and* that

discrimination was the real reason." *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1196 (11th Cir. 2024) (quotation marks and citation omitted). "[T]he pretext inquiry centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head." *Id.* (quotation marks and citation omitted). The Eleventh Circuit has "made clear that an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.* at 1195 (quotation mark and citation omitted). A plaintiff can show pretext by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (citation omitted). At all times, the plaintiff retains "the ultimate burden" of proving intentional discrimination. *Burdine*, 450 U.S. at 253. "To ultimately prevail, '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.'" *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1270 (11th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)); *see also Akridge* at 1193 ("[W]e hold that a plaintiff may not pursue an ADA

discrimination claim by showing 'a motivating factor' causation but must show but-for causation.").[23]   If the plaintiff cannot raise a genuine issue of material fact as to whether the employer's reason was pretextual, summary judgment is granted to the employer.  *Chapman*, 229 F.3d at 1024-25.

Alternatively, if not every element of the *prima facie* case can be met under the *McDonnell Douglas* framework, a plaintiff may demonstrate a triable issue of employment discrimination based on "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted).  Nonetheless, the "but-for" causation standard must still be met. *See, e.g.*, *Melvin v. Fed. Express Corp.*, 814 F. App'x 506, 512 (11th Cir. 2020) (ADEA).   A "convincing mosaic" can be established through evidence of "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)

---

[23] The same standard applies under the FCRA.  *See King v. HCA*, 825 F. App'x 733, 736 & n.2 (11th Cir. 2020) (discussing the but-for standard under the ADEA and ADA and noting that FCRA claims are analyzed under the same framework as claims brought under the ADEA and the ADA).

(alteration in original) (quotations and citation omitted).  A plaintiff "will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's intent." *Id.* (quoting *Smith*, 644 F.3d at 1328) (alteration in original).

FCRA discrimination claims are analyzed under the same framework as ADA and ADEA claims. *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1266 (11th Cir. 2014) ("Disability and age-related discrimination actions under the FCRA are analyzed under the same frameworks as the ADA and ADEA, respectively."). Courts may therefore consider these federal and state claims together. *See Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007).

## III. Discussion

### a. Age-Related Hostile Work Environment

To make a claim for a hostile work environment under the ADEA, a plaintiff must show that "(1) she is 40 years or older; (2) she was subjected to harassment, either through words or actions, based on age; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer." *Coles v. Post Master Gen. U.S. Postal Servs.*, 711 F. App'x 890, 898 (11th Cir. 2017) (internal marks omitted) (applying

Title VII standard to the ADEA).  While the ADEA prohibits harassment based on age, the ADEA "does not prohibit harassment alone, however severe or pervasive." *See id.* at 897-98.

For liability to arise, the behavior must create an environment "that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  At summary judgment, a court must accept that a plaintiff subjectively perceived the alleged harassment as hostile or abusive.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012).   In evaluating the objective severity of alleged harassment, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).[24]  The alleged conduct must be examined in context and cumulatively, looking at the totality of the circumstances. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).  The law is clear

---

[24] The Eleventh Circuit has held that fifteen instances of harassment over the course of four months was frequent, *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000), and five or six incidents over the course of three to four years was not, *Cargo v. Alabama, Bd. of Pardons & Parole Div.*, 391 F. App'x 753, 755 (11th Cir. 2010).

that offhand comments and isolated incidents, unless extreme, do not create a hostile work environment.  *See Faragher*, 524 U.S. at 788.  A hostile work environment claim is viable only if the work environment "was permeated with discriminatory intimidation, ridicule and insult."  *Harris*, 510 U.S. at 21 (citation omitted).

Kendrick experienced eight age-related comments and four instances in which she claims she was treated differently than her colleagues, all of whom were younger than her, over a period of approximately two years—hardly frequent.  Nor is the age-related conduct alleged by Kendrick, viewed in its totality, severe, physically threatening, or humiliating.  The record does not reflect a workplace permeated with discrimination, but rather an environment in which Kendrick was subjected to occasional offensive comments about her age.  Her hostile work environment claim therefore fails.

### b.  Failure to Accommodate: Two-Week Break Between Classes

Kendrick alleges that she faced discrimination based on her disability when White denied her an agreed accommodation to take a two-week break between teaching classes.  This allegation is unrelated to the complaints in Kendrick's Administrative Charges and the Court therefore dismisses it for failure to exhaust administrative remedies.

### c. Demotion

Kendrick alleges that she was demoted because of her age and disability.

### i. Age Discrimination

Kendrick has not introduced direct evidence that she was demoted because of her age because White's and Bowman's age-related remarks were not made by decisionmakers in relation to the decision-making process. *See Manigault*, 609 F. App'x at 985.

To establish a *prima facie* case of age discrimination under the ADEA or FCRA using circumstantial evidence, Kendrick must demonstrate that: (1) she was between the ages of forty and seventy; (2) she was demoted; (3) she was replaced by someone substantially younger than herself; and (4) she was qualified for the position from which she was demoted. *See Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015); *Manigault*, 609 F. App'x at 985.

Kendrick has made a *prima facie* case of age discrimination. She was over forty years of age and demoted from the position. Kendrick's position was filled, several months after her demotion, by a woman in her 30s—substantially younger than Kendrick's sixty years of age. When assessing qualification, courts examine the plaintiff's "skills and background." *Liebman*, 808 F.3d at 1299. "[I]f a plaintiff has enjoyed a long tenure at a certain position, [courts] can infer that he or she is

CASE NO. 3:22cv04833-MCR-ZCB

qualified to hold that particular position." *Damon*, 196 F.3d at 1360.  Kendrick served as a trainer for several years before Techfive's acquisition of the Crestview site, so the Court infers that she was qualified for the position.

Kendrick has met her burden of showing a *prima facie* case of age discrimination, and the burden now shifts to Techfive to proffer a legitimate, nondiscriminatory basis for Kendrick's demotion.  In the Corrective Action Form, Techfive explains that it demoted Kendrick in December 2018 because she did not timely coach new hire agents on quality quest calls, proactively instructed a new hire agent to resign due to failing quality quest, transferred no call / no show agents to production in the software environment, made negative comments about new hire agents and the company, allowed trainees to engage in inappropriate behaviors, and had the highest trainer attrition rate in 2018.  The Corrective Action Form describes the previous actions taken to inform Kendrick of these issues, noting that Kendrick received an Action Plan for September – October 2018 and passed it, but that she displayed repeat behaviors after the CAP ended.  She then received a PIP on November 21, 2018, as a result.  Techfive has satisfied its burden to show a legitimate reason for Kendrick's demotion.

Analysis of the PIPs, CAP, and Corrective Action Form, along with Kendrick's arguments, shows that Techfive's reason is not pretextual.

CASE NO. 3:22cv04833-MCR-ZCB

<u>September 26, 2017, PIP</u>

Kendrick received her first PIP on September 26, 2017, and signed it on

October 6, 2017.  The "Current Performance Situation" section, seemingly drafted

by White, states as follows:

> I have completed two observations on 23 June 17 & 14 July 17 of new
> hire training being delivered by Vanessa Kendrick.  I provided feedback
> on 21 July 17 to Vanessa Kendrick on what I had observed.   My
> feedback was: a lack of flow throughout the training & a lot of unused
> time in which agents would chat amongst themselves.   Based on
> feedback and observations, agents would at times find it difficult to
> follow & understand the training.   Vanessa predominantly relies on
> reading to the class from the material therefore we need to work on
> delivery of this to ensure a smooth flow & ensure we are delivering in
> a way in which the agents can easily comprehend which is still
> interactive & engaging.  Vanessa will need to understand and pay close
> attention to the varying learning styles of her students so she can assist
> quickly in gaining their understanding of the curriculum.  We recently
> had two members of Vanessa's last class leave iQor based on the
> quality of the training delivery in which we have talked about.
> Relationship building is key to having successful teams not only in
> performance but also in retaining our team members.  Communication
> is key & ensuring we remain professional throughout is essential.
> Recently we had a situation in which I observed below standard
> leadership skills along with difficulty in managing alternative
> personalities in team members.  Vanessa has the highest attrition in my
> training team in Crestview & we need to focus on reducing this through
> building effective relationships through high levels of professional
> engagement.    This will also help with de-escalating difficult &
> challenging situations.

ECF No. 45-3 at 271.  Kendrick drafted a written response to this PIP (apparently

on October 6, the day she signed it), stating that "8/23/17 I had two new hires

verbally attack me 'yelling' when I attempted to gain control of the class.  I became

very distraught and extremely fearful.  I immediately made my leader Kayleigh

White aware.  Kayleigh came into the classroom not to help me but to perform an

observation.  She stayed 5 min due to system issues with Trama programs. . . .  Now

after treatment [for anxiety] my 1st observation I was successful in functioning

within a normal range which lead to exceeding performance.  Prior to treatment

incapable of performing under extreme stress and or hostile environments." *Id.* at

272-73.

Kendrick's Response does not specifically rebut any of the statements in the

PIP, and instead states only that White created a false paper trail to give her an excuse

to get rid of Kendrick.  Nor do her contemporaneous written comments rebut White's

observations, other than—possibly—White's comment about "managing alternative

personalities."  Reviews from trainees in 2018 corroborate White's assessment of

Kendrick's teaching, so there is no genuine dispute that White simply invented the

statements in the PIP.  For example, in addition to the trainee review quoted at length

above, trainees provided the following reviews: "Vanessa speaks in a very monotone

voice which made it hard to engage;" "Very monotone but she did make sure we

understood the material;" "Lets people slide when they are not on time, not paying

attention & talking too much;" "Often very slow & boring, lots of downtime which made retaining information difficult."  ECF No. 45-8 at 24.[25]

September 18, 2018, Corrective Action Plan

Kendrick was issued a Corrective Action Plan (also called a Coaching and Action Plan in ECF No. 52-1) approximately one year later, on September 18, 2018. This CAP does not state specific problems with Kendrick's performance, instead describing strategies and goals for improvement.  The CAP is pictured below:



| STRATEGY / GOAL | STUDENT EVIDENCE | TRAINER EVIDENCE | Passed |
|---|---|---|---|
| Treat all employees equally<br>1) Provide consistent application of fairness to attendance policy<br>2) Provide each agent with sufficent coaching to aid in their success | 1) Survey Results specifically Q11 & Q12<br>2) End of class stats<br>3) Motivated, Happy employees | 1) Survey results specific to trainer feedback<br>2) End of class stats<br>3) Motivated, Happy employees<br>4) EDQ entries for disciplinary<br>5) EDQ entries for coaching | |
| Improved Stats<br>1) AHT, R7s, PPP & VOC will improve from 7/10 class<br>2) Targeted coaching specific to agent need | 1) Agent will improve from Week 4 to Week 6<br>2) EDQ entries for specific coaching | 1) WoW Improvement<br>2) End of class stats<br>3) EDQ entries for coaching<br>4) Improvement in all metrics from 7/10 class | |
| Invest, Share & Contribute to team action plans<br>1) Contribute ideas to the team<br>2) Share best practice – what works for you<br>3) Invest in ideas the team shares for implementation | 1) Team will have your input to ideas for success<br>2) Colleagues will be able to understand what is working for you & be able to utilize<br>3) Changes will be implemented in class/nesting & be visible to see | 1) WoW/Class on Class improvement<br>2) Ideas will be discussed in huddles & meetings<br>3) Changes will be visible in nesting & classroom environment | |
| Be pro-active & complete DDDM<br>1) Review data daily<br>2) Identify 3 outliers in each metric to coach<br>3) Deep Dive/What is root cause behind the metric | 1) Metrics will improve WoW for outlier agents<br>2) Improved agent morale<br>3) More agent celebration<br>4) Higher performing class | 1) Will be able to explain the root cause to coach the behavior<br>2) Improved stats<br>3) Be proactive in informing PDM of stats & actions | |

---

[25] This is not to say that Kendrick's reviews were universally negative.  One comment states that "Vanessa is great with people & has a good way of communicating to us."  But such statements are insufficient to rebut White's assessment of her teaching, which is evidently grounded in at least some trainees' assessments of her performance.

Kendrick similarly does not specifically rebut any of the statements in this CAP, again claiming only that White created a false paper trail to give her an excuse to get rid of Kendrick. The Court therefore accepts Techfive's assessment of Kendrick's performance as true. Additionally, reviews from trainees in 2018 corroborate that Kendrick did not treat trainees equally or provide sufficient coaching: "making sure we all go by the same rules & held to the same standards;" "obvious favoritism;" "[t]here were different expectations for each person, some were able to get away with certain things whereas others weren't, there was definitely a lack of consistency;" "she did also play favorites in the class when it came to absent or tardy employees;" "[t]here wasn't a really high impact coaching but the plan for success was kind of find your own way;" "no one was coached the same." ECF No. 45-8 at 24. These complaints, which come from trainees, rather than White, corroborate the assessments in the CAP.

<u>November 21, 2018, PIP</u>

Kendrick received another PIP in November 2018. It is lost (and the subject of the request for spoliation sanctions), but it is summarized in the Corrective Action Form Kendrick received before her demotion as follows: "11/21/2018 Performance Improvement Plan was issued specifying these specific action items: – Following attendance and policy practices consistently. – Addressing agent concerns in a

timely manner.  – Avoiding negative feedback on the production floor and training environment.   – Providing agents with sufficient coaching and support to be successful." ECF No. 52-1 at 3.  Kendrick does not specifically dispute any of these performance issues other than to claim in a conclusory fashion that they were falsely manufactured by White.  The Court therefore accepts them as true, and trainee reviews, quoted at length above, support the assessments that Kendrick did not follow policies consistently or sufficiently coach her trainees.

December 14, 2018, Corrective Action Form

Finally, Kendrick received a Corrective Action Form on December 14, 2018, and was demoted.  The Form describes the reasons for Kendrick's demotion as follows:

> Vanessa, since being issued a Performance Improvement Plan on 11/21/2018, overall observations have not met the action items and goals of performance and have impacted proper display of IQorian Values, specifically integrity, Open Communication, and Accountability.  Specific observations included:
> - Did not coach new hire agents on Quality Quest calls submitted on Wednesday, 11/21, therefore agents being coached same day as their follow up scores on Friday, 11/23.
> - Proactively instructed new hire agent to resign due to failing Quality Quest.
> - Transferred No Call / No Show agents to production Supervisors through NCNS occurred in OJT environment.
> In addition, feedback provided with the PIP included making negative comments about new hire agents and the company on the production floor/training environment, and allowing inappropriate behaviors to

continue from new hires without intervening.  These behaviors have resulted in Vanessa having the highest trainer attrition rate of 2018.

ECF No. 52-1 at 2.

Kendrick states in her Response that "Plaintiff always coached new hires on Quality Quest calls, and Plaintiff appropriately documented each of the coachings." ECF No. 49 at 8.  She also responds that "Plaintiff only answered a question posed to her about a new hire who asked about resigning, and then, Plaintiff only provided the information after speaking with Trainer McMillan; Plaintiff passed 2 new hires to operations after they successfully completed her course but were given approved leave; Plaintiff did not have the highest attrition rate of any trainer at the Crestview facility." *Id.* at 34.

The Court does not consider Kendrick's first statement to be a rebuttal of the first bullet in the Form.  The Form states that Kendrick failed to *timely* coach trainees, not that she failed to coach them entirely.  This gave trainees less time to improve before their next quality quest call.  Kendrick's response is not a head-on rebuttal, and Techfive's statement is therefore taken as true.

Kendrick's explanation that she did not instruct a new hire agent to resign but rather answered a question and provided the new hire information about resignation after speaking with McMillan is not a rebuttal.  The parties may have a different

understanding of the incident, but "the pretext inquiry centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head." *Akridge*, 93 F.4th at 1196 (internal marks and citation omitted). Kendrick has not shown that this basis for demotion is pretextual. The same is true regarding her explanation about transferring trainees to operations.

Finally, although Kendrick states that she did not have the highest attrition rate in Crestview, she cites nothing in the record to support this, stating only that she "was not provided with any specifics about her attrition rate and believes that the 2 agents on leave that returned were counted against her attrition rate, artificially increasing her rate," and that "White encouraged Plaintiff to wrongfully terminate new hires in a bid to increase Plaintiff's attrition rate." ECF No. 49 at 9. Kendrick cites her deposition testimony that White "was trying to get me to fire anybody and everybody at that point. She wanted me to fire this one girl because she sounded retarded is what she – was her term. But she just had a strong southern accent, and she was my best student. . . . Her name was Amanda." Kendrick was then asked whether "this Amanda, did you terminate that person?" Kendrick responded: "Oh, no." ECF No. 45-3 at 55-57. There is no evidence that White's pressure resulted in Kendrick artificially terminating trainees. Moreover, the evidence that *does* exist shows that Kendrick indeed had the highest attrition rate in Crestview. On

December 11, 2018, three days before the issuance of this Corrective Action Form, Kendrick's attrition rate was the highest in Crestview (though not in the entire enterprise this time).  ECF No. 45-3 at 363.  This document shows that there were five trainers in Crestview at the time, and that Kendrick's attrition rate was 27.06%, the highest of the Crestview trainers.  The other Crestview trainers had attrition rates of 14.00%, 17.14%, 23.53%, and 24.69%.  There were 32 trainers across the enterprise, and seven of them had attrition rates higher than Kendrick's.  The average attrition rate across the enterprise was 21.75%.  *Id.*[26]

Kendrick argues, relying on King's deposition, that the evidence of her poor performance should not be given weight because she was set up to fail.  However, King's testimony is not based on personal knowledge ("I don't know this for sure") and is otherwise conclusory (unspecified "unrealistic expectations").  Techfive's "exit plans," shorn of King's conclusory allegations of nefarious intent, are simply Performance Improvement Plans and Action Plans.  Kendrick's "set up to fail" argument does not show pretext.

---

[26] It is Kendrick's burden to show that she was treated worse than other, younger trainers. Kendrick provides no information at all regarding these non-Crestview trainers, including their age and whether they, too, were demoted.

CASE NO. 3:22cv04833-MCR-ZCB

Kendrick also argues that Techfive's evidence supporting the bases for her demotion should be disregarded under the "cat's paw" theory, which "provides that causation may be established if the plaintiff shows that the decisionmaker followed [a] biased recommendation without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (citation omitted).  The ADEA "requires a 'but-for' link between the discriminatory animus and the adverse employment action," so to establish a viable cat's paw theory under the ADEA, "[Kendrick] must prove that [White's] animus was a 'but-for' cause of, or [had] a determinative influence on, [Techfive's] ultimate decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1336-37 (11th Cir. 2013).

Kendrick alleges that White fabricated evidence regarding her performance and behavior, but without any evidence in support of the allegation, this is disregarded.  *See McCurdy v. Alabama Disability Determination Serv.*, 753 F. App'x 784, 794 (11th Cir. 2018) ("Conclusory allegations . . . that [the defendant] manipulated her evaluations, do not create a genuine issue of material fact regarding whether [the defendant's] stated reason for termination was a pretext for illegal discrimination.").  But even if White fabricated evidence, there is sufficient evidence

in the record *untouched by White*, detailed at length above, supporting Techfive's stated basis for demoting Kendrick.  Emails by Wilt and McMillan, trainee reviews, and a screenshot of attrition rates *taken by Kendrick* show that Techfive's assessment that Kendrick had difficulty teaching material, favored certain trainees over others, and had a high attrition rate as a result, are all supported by evidence independent of White.  Kendrick has not shown that White's alleged discriminatory animus was a but-for cause of her demotion.

There are other factors supporting this conclusion.  First, White made six out of eight ageist statements in 2017, one year or more before Kendrick was terminated.[27]   Although the statements are certainly circumstantial evidence of discrimination, they occurred well before the decision to terminate Kendrick, and Techfive has identified legitimate reasons for the demotion.  *See, e.g.*, *Robertson v. Riverstone Communities, LLC*, 849 F. App'x 795, 807 (11th Cir. 2021) (in race discrimination case, the supervisor's racist "statements also occurred outside the context of and well before the decision to fire [Plaintiff].  And [Employer] has identified objective and legitimate business reasons for [Plaintiff's] termination— her sustained decline in performance.").

---

[27] The record lacks dates for the two other statements.

Second, King testified in deposition that White disliked many employees, not just Kendrick, which cuts against an inference of discrimination.  King testified that "it was known – a known item that [White] was not a fan of Vanessa, or myself, or a couple of other trainers for that matter."  ECF No. 45-4 at 15-16.  King, notably, was 30 years old, so her dislike of him could not have been based on his age.  The Eleventh Circuit recognizes the Vince Lombardi rule, "that no player could accuse the great coach of discrimination because he treated all of them like dogs."  *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1258 (11th Cir. 2010).  Some managers are just difficult to work for, and the courts offer no relief for that.

The Court finds *Melvin v. Federal Express Corporation*, 814 F. App'x 506 (11th Cir. 2020), particularly instructive.  In that case, Melvin's supervisor, Stephens "pressured him to resign in their first one-on-one meeting because of his age, questioning whether he 'wanted to continue to do this' 'given . . . [his] age' and stating that he should 'let the young guys do it.'"  *Id.* at 513 (alterations in original).  Approximately one month after this conversation, Stephens issued Melvin a disciplinary letter, and within six months of the conversation, Stephens fired Melvin because he had received three disciplinary letters within twelve months.  The Eleventh Circuit considered the ageist remarks along with Melvin's other pretext evidence and held that there was no triable issue of fact regarding age discrimination

under the mosaic theory.  The court reviewed each disciplinary letter and concluded that the issues identified in each letter were substantiated by the evidence.

The same is true here.  A majority of the infractions and issues identified in each PIP, the CAP, and the Corrective Action Form are substantiated by the evidence and have not been rebutted head on by Kendrick.  *See Chapman*, 229 F.3d at 1030 ("an employee must meet [the employer's proffered nondiscriminatory] reason head on and rebut it").  In *Melvin*, the Eleventh Circuit found similar explanations about misunderstandings between the plaintiff and his supervisor and similar failures to rebut the employer's evidence insufficient to create an issue of fact on the employer's discriminatory intent.  *See Melvin*, 814 F. App'x at 514-518.

This is true even under the "convincing mosaic" standard, which assesses "among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (alteration in original) (quotations and citation omitted).  The timing here is not suspicious. Kendrick was demoted one and a half years after White became her supervisor, and one year after White's last dated ageist statement.  There is no evidence that Kendrick was treated systematically worse than other employees.  On the contrary,

King, a thirty-year-old trainer, was terminated after engaging in a verbal altercation with White, showing that other trainers also faced consequences for inappropriate behavior.  Additionally, Kendrick does not specifically dispute the vast majority of the performance issues for which she was demoted.  She simply objects to the characterizations of her performance and/or says that White lied.  This is insufficient to create an inference of age discrimination in Kendrick's demotion.

### ii.  Disability Discrimination

Kendrick has not proffered any direct evidence of disability discrimination.  To make a *prima facie* claim of disability discrimination based on circumstantial evidence, Kendrick must show that "(1) she has a disability; (2) she is a qualified individual with or without a reasonable accommodation; and (3) she was discriminated against because of her disability."  *Gilliard v. Georgia Dep't of Corr.*, 500 F. App'x 860, 867 (11th Cir. 2012) (citation omitted).  As with age, Kendrick must show that "disability was a 'but-for' cause of the adverse employment action— meaning it had a 'determinative influence on the outcome' of the employer's decision."  *King v. HCA*, 825 F. App'x 733, 736 (11th Cir. 2020) (citations omitted).

Kendrick does not proffer any evidence that she was demoted because of her anxiety, panic disorder, and/or PTSD.  Even if she had, she fails to show that Techfive's nondiscriminatory reason for demoting her is pretextual.  As discussed

above, there is sufficient evidence that she was demoted for poor performance and inappropriate behavior.  Kendrick has not rebutted this evidence head on or revealed any "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in TechFive's proffered reasons for its actions.   *Springer*, 509 F.3d at 1348. Kendrick does not allege that the evidence demonstrates a mosaic of disability discrimination, and the evidence indeed does not do so.

### d.  Failure to Promote

Kendrick alleges that Techfive failed to promote her in retaliation for the filing of her First Administrative Charge of Discrimination and because of her age.[28]  Both of these claims are based on circumstantial evidence and thus analyzed under the burden-shifting framework established in *McDonnell Douglas*, as described above.

### i.  Age Discrimination

To establish a *prima facie* case of failure to promote due to age under the ADEA and the FCRA, Kendrick must demonstrate (1) that she was a member of the protected group of persons between the ages of forty and seventy; (2) that she applied for a promotion and was not promoted; (3) that an equally or less qualified

---

[28] Kendrick alleges that the failure to promote was "in continued disparate treatment due to her age and/or actual and or perceived disability and record of impairment."  ECF No. 40 ¶ 50. Kendrick does not make any factual statements regarding disability in relation to Techfive's failure to promote her, so the Court disregards the conclusory allegation of disability discrimination.

substantially younger person filled the position she sought; and (4) that she was qualified to do the job for which she was rejected. *See Chapman*, 229 F.3d at 1024.

It is undisputed that Kendrick is between the ages of forty and seventy and that she was not promoted to the roles for which she applied.[29]  However, Kendrick has failed to show that a substantially younger person was hired for those jobs, and thus fails to make a *prima facie* case.  The ages of the people hired for roles to which Kendrick applied are not noted in the record.[30]  Kendrick's recollection that an unidentified younger person was hired to one position is conclusory and insufficient to make a *prima facie* claim for age discrimination.

### ii.  ADA and ADEA Retaliation[31]

To establish a *prima facie* case for retaliation under the ADA or ADEA, the plaintiff must show that (1) she filed a charge of discrimination; (2) she suffered an

---

[29] Because the evidence is construed in the light most favorable to Kendrick, the Court assumes for purposes of this summary judgment motion that she applied to two trainer roles and two supervisor roles.

[30] In its Motion for Summary Judgment, Techfive states that Goins was born in 1978.  ECF No. 44 at 11.  The record, however, does not note his age or date of birth.  Even assuming he was younger, Kendrick does not dispute Techfive's explanation that it hired him in order to manage headcount due to COVID-19.

[31] Kendrick's federal retaliation claims are limited to the allegations in her Second Administrative Charge of Discrimination, which relate only to Techfive's failure to promote her, and Kendrick makes no retaliation claim under the FCRA.  Her retaliation claims and arguments regarding other conduct by Techfive are therefore disregarded.

adverse employment action; and (3) there was a "causal link" between the adverse action and filing of the Charge. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001); *see Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (outlining elements of a *prima facie* retaliation claim under "either Title VII, the ADEA or the ADA"). To establish a causal link, the plaintiff must show that the "relevant decisionmaker" was aware that she filed a charge of discrimination and that the filing and non-promotion were not "wholly unrelated." *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) (citation omitted).

Kendrick has neither argued nor shown that the decisionmaker responsible for promotions was aware of her protected conduct and she has therefore failed to make a *prima facie* case of retaliation.

### e. Miscellaneous Allegations: 2021 Shift Schedule, 2020 Bonus Policy, and 2019 Performance Review and Raise

Summary judgment is granted on Kendrick's claims relating to (1) her shift schedule in 2021, (2) Techfive's bonus policy, which was announced four months after she filed the Second Administrative Charge, and (3) her 2019 performance evaluation and raise on two grounds: first, because Kendrick has not exhausted her administrative remedies as to these allegations, and second, because they are meritless.

CASE NO. 3:22cv04833-MCR-ZCB

None of these allegations is "like, related to, or grew out of" the allegations in the Administrative Charges.  They are entirely distinct from Kendrick's demotion, Techfive's failure to promote her, and White's harassment, not least because White stopped working at Techfive in June 2019, before any of these events occurred. None of these events could have reasonably expected to be within the scope of the EEOC's investigation of Kendrick's administrative charges.

Moreover, two of these events took place after White filed the Second Administrative Charge.[32]  A claim arising out of an event that postdates the filing of a charge of discrimination is not administratively exhausted.  *See Little v. CSRA, Inc.*, 834 F. App'x 495, 498 (11th Cir. 2020) (affirming dismissal of claims relating to termination that occurred one month after plaintiff filed her EEOC charge because they "were not (and could not have been) included in her EEOC charge").

Substantively, there is no dispute that (1) Kendrick received the shifts, days off, and breaks she requested in 2021, (2) received a bonus and merit increase in 2020, and (3) received a raise for 2019, albeit belatedly.  Kendrick therefore cannot

---

[32] Kendrick's "continuing violations" argument, ECF No. 49 at 18, is irrelevant, because the doctrine applies only to the timeliness of a plaintiff's filing of an administrative charge of discrimination.

CASE NO. 3:22cv04833-MCR-ZCB

show that she was discriminated against or was subject to an adverse employment action vis-à-vis these allegations, an essential element of each of her claims.

### f.  Failure to Accommodate: 2020 Refusal to Leave Customer Calls

Summary judgment is also granted on the claims related to the allegation that Techfive discriminated against Kendrick by denying her an accommodation of leaving customer calls mid-call or requiring a supervisor take over her calls in the event of a panic attack because (1) Kendrick raised this claim for the first time in her Response; (2) she did not exhaust her administrative remedies regarding this allegation; and (3) these are not reasonable accommodations required by law.

Kendrick makes no mention of her requested accommodation to leave customer calls in her Third Amended Complaint.  It is well-established that a party may not raise a new claim or theory in response to a summary judgment motion.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004).  This theory is therefore not properly before the Court.

Additionally, Kendrick's failure to accommodate claim is unrelated to her alleged harassment, demotion, or non-promotion, so her claim has not been administratively exhausted.  *See Booth v. City of Roswell*, 754 F. App'x 834, 837 (11th Cir. 2018) (affirming dismissal of claims of failure to accommodate and hostile work environment where the EEOC charge only mentioned termination).

CASE NO. 3:22cv04833-MCR-ZCB

Finally, Kendrick's claim is substantively meritless. "An accommodation is 'reasonable' and necessary under the ADA . . . only if it enables the employee to perform the essential functions of the job." *Holly*, 492 F.3d at 1256. "If the individual is unable to perform an essential function of his [ ] job, even with an accommodation, he is . . . not covered under the ADA." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005) (internal marks and citation omitted). One basis on which a "job function may be deemed essential" is that "the reason the position exists is to perform the function." *Id.* at 1230.

Kendrick admits that "it's an essential function of [her] position to talk to customers." ECF No. 45-3 at 106. Indeed, handling customer calls is the reason the position of customer call agent exists. Techfive was not required to accommodate Kendrick's request. *See Jackson v. Humana Ins. Co.*, No. 22-2299, 2023 WL 2207632, at *2 (7th Cir. Feb. 24, 2023) (affirming summary judgment for Defendant where Plaintiff customer care agent ended three customer calls improperly due to anxiety attacks because "she could not perform the essential function of her call-center job of reliably handling phone calls."); *Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1582 (N.D. Ga. 1994) (finding that "handling telephone calls was an essential function of the [customer service representative] position").

Accordingly:

1. Defendant's Motion to Strike, ECF No. 56, is **DENIED**.

2. Defendant's Motion for Summary Judgment, ECF No. 44, is **GRANTED**.

3. The Clerk is directed to enter final judgment in TechFive's favor, tax costs against Kendrick and close the file.

   **DONE AND ORDERED** this 29th day of March 2024.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**